# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| **CHERYL ANN CHAMBLEE,** | ) | **Case No. 12-05491-TOM-7** |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| **GAIL L. ANDREWS,** | ) | |
| | ) | |
| Plaintiff, | ) | **A.P. No. 13-00021-TOM** |
| vs. | ) | |
| | ) | |
| **CHERYL ANN CHAMBLEE,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

This adversary proceeding came before the Court for trial on January 22, 2014, and February 3, 2014. Appearing before the Court were Lee R. Benton and Jamie Alisa Wilson, counsel for the Defendant/Debtor; Gail Lindley Andrews, *pro se* Plaintiff; Cheryl Ann Chamblee, the Defendant/Debtor; Jodi Ketchersid, witness for the Plaintiff; and George Andrews, witness for the Plaintiff. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(a) and the District Court's General Order Of Reference Dated July 16, 1984, As Amended July 17, 1984.[1] This is a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. §

---

[1] The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides:

The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

157(b)(2)(I).[2]  This Court has considered the pleadings, arguments, the testimony of the Debtor, Plaintiff, and witnesses, and the law, and finds and concludes as follows.[3]

## **FINDINGS OF FACT**[4]

This adversary proceeding concerns a mortgage debt owed by Ms. Chamblee to Ms. Andrews.  Ms. Andrews asserts that but for misrepresentations made by Ms. Chamblee she would not have loaned Ms. Chamblee money, and therefore the debt should be held nondischargeable.  The trial of this adversary proceeding spanned one and one-half days and the parties introduced hundreds of pages of exhibits. The parties' accounts of the factual background differ in material respects.

According to the testimony of both parties, Ms. Chamblee and Ms. Andrews first became acquainted with each other in June 2007.  Ms. Chamblee testified that she was looking at houses for sale in Ms. Andrews's neighborhood when she was approached by George Andrews, Ms. Andrews's husband, who asked if she would like to view the Andrews's home.  She testified that she later contacted Ms. Andrews to set up an appointment, and at the time she viewed the house she and Ms. Andrews discussed Ms. Chamblee's desire to move from Destin, Florida, where she worked as a realtor, to Birmingham so that her son could attend Altamont School.  According to Ms. Chamblee she informed Ms. Andrews that she would work in Birmingham as a realtor and also continue to

---

[2]28 U.S.C. §157(b)(2)(I) provides as follows:

(b)(2)Core proceedings include, but are not limited to–
(I) determinations as to the dischargeability of particular debts[.]

[3] This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

[4] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files.  *See ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343 (5th Cir. Unit B July 1981); *Florida v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975).

2

work in Destin as a realtor.

Ms. Chamblee testified that she does not recall speaking with Ms. Andrews about the selling price of the house at that time, but that Ms. Andrews had that discussion with Ms. Chamblee's ex-husband when he came to see the house. At some point the parties agreed that Ms. Andrews would sell the house to Ms. Chamblee for $950,000.00. *See* Joint Exh. 6, Real Estate Sales Contract. Ms. Andrews testified that when Ms. Chamblee's ex-husband asked if she would hold the mortgage she declined; however, she did agree to Mr. Chamblee's request that she hold a smaller second mortgage. According to Ms. Andrews he represented that he was developing a condominium project, and further, that when the development was ready in a couple of years Ms. Chamblee would sell the units and the second mortgage loan owed to Ms. Andrews could be repaid. Ms. Andrews stated that Mr. Chamblee asked that a no-prepayment-penalty clause be added to the contract so that Ms. Chamblee would not be penalized if the loan could be paid off more quickly. Ms. Andrews, a licensed attorney who serves as a law clerk to a state court judge presiding over civil cases, and who has a private law practice doing some family and/or domestic relations work on her own, drafted the Real Estate Sales Contract ("Sales Contract") at the request of Mr. Chamblee. The Sales Contract, which incorporated her agreement to hold a second mortgage, provided that $700,000[5] of the purchase price would be paid at closing, and Ms. Andrews would hold a second mortgage securing a Promissory Note (the "Note") in the amount of $250,000 to be repaid with $50,000 interest on or before August 10, 2009. *See* Joint Exh. 6, Real Estate Sales Contract. Ms. Andrews testified that she wanted the Sales Contract to contain a requirement that Ms. Chamblee provide either a "letter of credit" or

---

[5] Ms. Andrews testified that she owed approximately $350,000 on a note secured by a mortgage on the property.

3

"affirmation of loan approval" within 10 days of the Sales Contract being signed. According to Ms. Andrews, her husband had been diagnosed with Parkinson's disease and they had a lot of belongings to move; thus she needed proof that Ms. Chamblee would be getting a first mortgage loan before they undertook the effort to move within 30 days as Ms. Chamblee requested.

Ms. Chamblee testified that after signing the Sales Contract she went to the beach for the Fourth of July holiday, and upon returning, she informed Ms. Andrews that she was unable to obtain a letter of credit or affirmation of loan. Each of the parties has a different version of what happened next. According to Ms. Chamblee she offered to Ms. Andrews the good faith estimate prepared by her first mortgage lender, Countrywide Bank ("Countrywide"), reflecting the interest rate, loan charges, and other information that would indicate to Ms. Andrews she was working to obtain a loan. In contrast, Ms. Andrews testified that Ms. Chamblee offered and she agreed to accept Ms. Chamblee's loan application prepared for Countrywide ("Loan Application" or "Application") in lieu of a letter of credit and affirmation of loan. Although the Sales Contract specified that Ms. Chamblee was to provide both a letter of credit and an affirmation of loan, Ms. Andrews apparently proceeded as if Ms. Chamblee was required to produce only one or the other because, according to Ms. Andrews's testimony, she closed the sale and loan despite having received only the Loan Application. Ms. Andrews claimed that she received a copy of the Loan Application via email although she could not remember if Ms. Chamblee or a Countrywide representative emailed it to her.[6] Ms. Andrews could not establish with certainty how she obtained the Loan Application because, she asserted, the computer that she used at the time had since "crashed" and she lost all of

---

[6] Jennifer Fiske (now Jennifer Parsons), the Countrywide loan officer working with Ms. Chamblee, testified in her deposition that Countrywide employees could at no time provide customer information to third parties. *See* Joint Exh. 10, Deposition of Jennifer Parsons.

4

its contents. Ms. Chamblee disputes that she provided the Loan Application to Ms. Andrews. She testified that she received the Loan Application along with other loan documents through some form of express mail and not email, that she did not recall emailing Ms. Andrews a copy of the Loan Application, and further, that the Loan Application contained personal information that she would not have provided to someone she barely knew. Nonetheless, Ms. Andrews either accepted something in place of the letter of credit and affirmation of loan, which were called for in the Contract, or waived or ignored the requirement, because her mortgage loan to Ms. Chamblee and the sale of the house closed June 26, 2007.[7]

Ms. Andrews testified that because she financed a portion of the purchase price for Ms. Chamblee, she likewise financed a portion of the purchase price of her new home with the sellers. Ms. Andrews contends that when Ms. Chamblee did not pay off the second mortgage loan from Ms. Andrews when due, Ms. Andrews had to arrange alternative financing to pay off her own mortgage loan.

Ms. Chamblee testified that she made all of the payments due on her first mortgage loan from Countrywide for the first two years of owning the home and during that time spent approximately $100,000 on home improvements. She further testified that she could not continue to pay the first mortgage payments after the first two years; accordingly, she listed the house for sale in September 2009 and it remained on the market until November 2011. It was her testimony that during this time

---

[7] The Note from Ms. Chamblee to Ms. Andrews, as amended, provided that Ms. Chamblee would make 23 payments of principal and interest in the amount of $804.10 per month prior to July 25, 2009, and that Ms. Chamblee would make one final balloon payment in the amount of $284,635.86 due on July 25, 2009. It is not clear from the testimony and evidence presented at trial how much, if any, that Ms. Chamblee paid pursuant to the terms of the Note prior to its maturity.

5

she continued to maintain and repair the home, showed the house to prospective purchasers every Sunday, and attempted to keep Ms. Andrews informed of her efforts to sell the house. Ms. Chamblee also stated that she was able to stave off a foreclosure sale by Countrywide while she worked to obtain a short sale, and that she was finally able to sell the home via short sale within a day of the foreclosure sale set pursuant to Countrywide's second foreclosure notice. To close the short sale, Ms. Andrews agreed to accept $44,000 from the purchaser of the home toward the second mortgage debt owed to Ms. Andrews. Ms. Chamblee noted that the short sale allowed Ms. Andrews to be paid the $44,000, and that had the short sale not occurred and Countrywide's foreclosure sale taken place instead, that Ms. Andrews would have likely received nothing.

Ms. Andrews contends that she would not have made the loan to Ms. Chamblee in the first place had Ms. Chamblee not made false representations about her financial condition. According to Ms. Andrews, she had been told by both Ms. Chamblee and her ex-husband that Ms. Chamblee would be selling condominiums in a project in Florida that Mr. Chamblee was developing. She claims that Mr. Chamblee represented to her that the condominiums would be sold by Ms. Chamblee within a couple of years and that the loan she extended would be paid at that time. Ms. Andrews called Jodi Ketchersid, owner of Real Joy Properties in Destin, as a witness. Ms. Ketchersid testified that Ms. Chamblee had worked as a realtor at Real Joy Properties. Ms. Ketchersid further testified that she too was told that Ms. Chamblee would sell condominiums being developed by Mr. Chamblee but she later discovered that the condominium project in Florida did not actually exist.

The bulk of allegedly false statements that Ms. Andrews testified she relied on were contained in the Loan Application. Ms. Chamblee testified that the Loan Application did in fact contain errors, namely (1) that she had $300,000 in a bank account at the time the Loan Application

6

was completed; (2) that she had employment income in the amount of $15,000 per month; (3) that she received $8,437 in child support and alimony per month; and (4) that there was an outstanding judgment against her. Ms. Chamblee also noted that the Loan Application incorrectly reflected that she had no dependents and that the house she was purchasing was built in 2002. Ms. Chamblee testified that in actuality her bank account at the time contained over $3,000, not $300,000.[8] She further testified that between $10,000 and $15,000 was deposited into her bank account every month, including not only employment income but also child support and other monies that she received from her ex-husband.[9] The bank statements offered into evidence at trial reflect these deposits into her account. She explained that she was awarded $5,500 child support per month in her divorce decree but her ex-husband sometimes gave her funds in excess of that amount. She also explained that although a judgment had been entered against her some time ago, it incorrectly appeared on the Loan Application as it had been resolved and was no longer outstanding.

According to Ms. Chamblee, she had provided the information for the Loan Application to Countrywide loan officer, Jennifer Fiske, over the telephone, then received the completed Loan Application in a package of other loan documents that were mailed to her. She stated that she corrected by hand the part of the Application regarding the judgment then called Jennifer Fiske to inform her of all of the errors. Ms. Chamblee further stated that Ms. Fiske made her feel as if she had done something wrong by marking on the Loan Application; thus she made no other corrections by hand but simply initialed the one change she had made, signed the Application, and sent it back

---

[8] A bank statement introduced into evidence reflected a balance of $$3,683.40 in Ms. Chamblee's account as of June 26, 2007. *See* Plaintiff's Exh. 45, Wachovia Bank statement for June 27, 2007 through July 27, 2007.
[9] Ms. Chamblee testified that her income as reported in her 2007 tax return totaled $45,357.00. *See* Plaintiff's Exh. 33, 2007 Federal Tax Return of Cheryl Chamblee.

7

to Countrywide as instructed. She asserts Ms. Fiske informed her she would have a corrected Loan Application to sign at closing. Ms. Andrews testified that she was not aware a corrected Loan Application existed until she obtained it in discovery during this litigation. Ms. Chamblee admitted that she did not provide the corrected Loan Application to Ms. Andrews, but also pointed out that neither Ms. Andrews nor the Contract requested or required a loan application. Ms. Andrews, who testified that she had bought and sold other houses before her transaction with Ms. Chamblee, also testified that she did not seek any financial documents from Ms. Chamblee other than the "letter of credit" and "affirmation of loan" required in the Sales Contract. She admitted she did not perform a credit check and did not ask Ms .Chamblee about her monthly bills and other obligations.

Upon questioning by Ms. Andrews, Ms. Chamblee testified that she was aware Ms. Andrews could have voided the Contract since Ms. Chamblee did not provide the "letter of credit" and "affirmation of loan" as required. Ms. Chamblee also testified that she did not believe that a "letter of credit" would have given Ms. Andrews information as to what Ms. Chamblee was worth.

George Andrews, Ms. Andrews's husband and a retired attorney, testified on her behalf. According to Mr. Andrews, he and Ms. Andrews agreed that before they uprooted their own lives they wanted assurance that Ms. Chamblee and her ex-husband, Mr. Chamblee, were solvent, credit-worthy people who would be able to obtain a first mortgage loan and to also repay the money being loaned by Ms. Andrews. Mr. Andrews admitted that he relied in some respects on Countrywide to investigate Ms. Chamblee's financial condition, as he believed that a bank would investigate prior to making a $700,000 loan. Mr. Andrews acknowledged that Ms. Andrews could have included a provision in the sales contract requiring Ms. Chamblee to produce a financial statement, but he thought Ms. Andrews believed that she was asking for a financial statement in the Contract. He

8

testified that it was his understanding that a "letter of credit" was an affirmation from a bank that the potential borrowers were solvent and he could do business with them, and was basically the same as an "affirmation of loan" required by the Sales Contract.

Mr. Andrews stated that he had seen Ms. Chamblee's Loan Application for the first time in early July 2007, and after reviewing it formed the opinion that Ms. Chamblee had a good income, had assets, and it was fine to proceed with the loan transaction; he therefore supported his wife's decision to go forward with the Sales Contract. He testified that he knew that some information on the loan application was incorrect, such as the year the house was built and that Ms. Chamblee did have a dependent son. He also testified that, although the Loan Application provided that the Application could be amended if any information changed, he could not remember if the possibility of an amendment crossed his mind at the time. He stated that neither he nor Ms. Andrews followed up with anyone to make sure the Loan Application was correct because they believed Ms. Chamblee. Mr. Andrews testified that he and Ms. Andrews did not require a credit check, tax returns, bank records or a Social Security number, and did not investigate whether Ms. Chamblee had any judgments against her in Florida, her state of residence.

Ms. Andrews testified she brought suit against Ms. Chamblee in the Circuit Court of Jefferson County, Alabama, and obtained a judgment against her in September 2011, for the balance owed on the Note secured by the second mortgage. Ms. Chamblee filed her chapter 7 bankruptcy petition on November 19, 2012, and Ms. Andrews filed this adversary proceeding on February 14, 2013.

## CONCLUSIONS OF LAW

Ms. Andrews seeks to have the debt owed to her declared nondischargeable under 11 U.S.C.

sections 523(a)(2)(A), 523(a)(2)(B), and/or 523(a)(6). A plaintiff has the burden to prove by a preponderance of the evidence that a debt should not be discharged under each of these sections. *Grogan v. Garner*, 498 U.S. 279, 286, 11 S. Ct. 654, 659 (1991) ("[T]he preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants.").

**11 U.S.C. § 523(a)(2)(A)**

According to the Eleventh Circuit Court of Appeals, "the fraud exceptions to discharge exist to punish the debtor for committing fraud." *St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 680 (11th Cir. 1993) (citation omitted). Section 523(a)(2)(A), one of the fraud exceptions to discharge, provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt -
> ...
>    (2) for money . . .
>      (A) false pretenses, a false representation, actual fraud . . .

11 U.S.C. § 523(a)(2)(A). To obtain a determination that section 523(a)(2)(A) bars a specific debt from discharge, the creditor must prove that "'(1) the debtor made a false representation to deceive the creditor, (2) the creditor relied on the misrepresentation, (3) the reliance was justified, and (4) the creditor sustained a loss as a result of the misrepresentation.'" *Sears v. United States*, 533 Fed. App'x 941, 945 (11th Cir. 2013) (*quoting In re Bilzerian*, 153 F.3d 1278, 1281 (11th Cir. 1998)).

It has been explained that:

> The concept of "false pretenses" is especially broad. It includes any intentional fraud or deceit practiced by whatever method in whatever manner. False pretenses "may be implied from conduct or may consist of concealment or non-disclosure where there is duty to speak, and may consist of any acts, work, symbol or token calculated and intended to deceive." Black's Law Dictionary 602 (6th ed. 1990). It is a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or a false and misleading understanding

10

of a transaction, by which a creditor is wrongfully induced by a debtor to transfer property or extend credit to the debtor. Silence or concealment as to a material fact can constitute false pretenses. In short, false pretenses can be made in any of the ways in which ideas can be communicated. It is, therefore, essentially impossible to conceive of a set of circumstances that would constitute "actual fraud" under the Black's Law Dictionary definition, but which would not also constitute "false pretenses," as that term has historically been defined.

*FCC National Bank v. Gilmore (In re Gilmore)*, 221 B.R. 864, 872 (Bankr. N.D. Ala. 1998) (Cohen, J.) (some citations omitted).

In the case *Schweig v. Hunter*, the creditor sought a determination of nondischargeability of a debt owed to him because the debtor, an account executive for a securities broker, never disclosed his affinity for gambling or his past embezzlement of funds from his customers. *Schweig v. Hunter*, 780 F.2d 1577, 1578-79 (11th Cir. 1986) (*abrogated on other grounds by Grogan v. Garner*, 498 U.S. 279 (1991))[10]. Before loaning the debtor $168,000, the creditor did not ask the debtor about his financial condition, did not request a financial statement, and did not perform a credit check. *Id*. at 1578. When prosecuting his case the creditor did not identify any "express, affirmative misrepresentations," relying solely on the debtor's failure to disclose his financial circumstances. *Id*. 1579. The bankruptcy court determined that the debtor was entitled to discharge the debt and that decision was affirmed by the district court. *Id*. at 1579. The Court of Appeals agreed with the bankruptcy court's determination that a debtor is not required to voluntarily disclose "personal habits, tendencies, welfare and life style" unless the creditor sought the information. *Id*. at 1580.

---

[10] In *Hunter*, the Eleventh Circuit Court of Appeals stated that the creditor must establish the elements to except a debt from discharge by the "clear and convincing evidence" standard. *Hunter*, 780 F.2d at 1579. However in *Grogan v. Garner* the United States Supreme Court, resolving a circuit split, held that the "preponderance of the evidence" standard was applicable to the section 523(a) dischargeability exceptions. *Grogan*, 498 U.S. at 291, 111 S.Ct. at 661. The remainder of *Hunter* has not been abrogated or overturned.

11

The Court of Appeals opined:

> [The facts of the case] "reveal[ed] an example of misplaced trust and failure to investigate creditworthiness or to ferret out ordinary credit information. This court does not believe the circumstances surrounding the failure to use ordinary precautionary measures prior to making a sizable loan warrant finding that the debtor was bound to volunteer or confess his transgressions . . . ."

*Id.* Thus, the failure of the debtor to disclose unfavorable facts before obtaining a loan did not equal false pretenses, false representation, or actual fraud.

Ms. Andrews testified that during one of their conversations Ms. Chamblee told her that her ex-husband was a condominium developer and that she would be selling condominiums in Florida for him. She also testified that Mr. Chamblee, the ex-husband, asked her to hold a mortgage on a portion of the purchase price for a couple of years at which time the Florida condominiums would have been sold and the second mortgage loan could be repaid. Ms. Ketchersid, who worked with Ms. Chamblee in Destin, testified that the condominium development Mr. Chamblee was purportedly developing did not exist. There was no testimony or other evidence presented at trial that Ms. Chamblee represented that the second mortgage loan would be repaid from the Florida condominium proceeds. Thus, whether or not Ms. Andrews relied on Mr. Chamblee's alleged representation is immaterial, as it was not a statement made by the debtor.[11]

Ms. Andrews's argument that the debt should be excepted from discharge under section 523(a)(2)(A) is based less on express misrepresentations allegedly made by Ms. Chamblee than on

---

[11] It is not clear that Mr. Chamblee intended to deceive Ms. Andrews either. If he had such an intention there would have been no reason for him to negotiate a provision in the Contract providing that the loan could be repaid early with no penalty. Furthermore, to the extent that Mr. Chamblee's statement could be considered a promise to repay Ms. Andrews from the sale of the Florida condominiums, the promise was not memorialized in the subsequent Sales Contract. Regardless, it was a statement made by Mr. Chamblee, not Ms. Chamblee.

12

what Ms. Chamblee did not say.[12]  Ms. Andrews made clear through her testimony and through her examination of Ms. Chamblee that Ms. Chamblee did not provide her with financial information. However, Ms. Andrews never asked for the information.  Ms. Andrews and Mr. Andrews each testified that Ms. Andrews wanted proof that Ms. Chamblee's first mortgage loan would close.  Ms. Chamblee testified that she had understood Ms. Andrews wanted to know whether or not she could obtain a first mortgage loan; thus she provided Ms. Andrews with a good faith estimate from Countrywide to show she was fulfilling her part of the contract by making a good faith effort to obtain a loan.  Significantly, upon being asked by Ms. Andrews if she thought that Ms. Andrews would have the right to her financial information, Ms. Chamblee answered that Ms. Andrews did not ask for it in the Sales Contract.

Through their testimony at trial it became apparent that Ms. Andrews and Mr. Andrews were looking for assurance that Ms. Chamblee was "creditworthy" in the sense that she would have the financial means to obtain a first mortgage loan and be able to repay the second mortgage loan.  The fact that Ms. Andrews asked if Ms. Chamblee believed a "letter of credit" would have given her financial information further reinforces this conclusion.  Ms. Andrews testified that at the time she asked for a "letter of credit" in the Sales Contract she was looking for evidence that Ms. Chamblee could pay, and did not understand at the time that "letter of credit" had a different meaning.[13]  While

---

[12] Section 523(a)(2)(A) does not include "deception carried out by means of a statement relating to the debtor's or an insider's financial condition" as that type of deception is addressed by section 523(a)(2)(B).  4 *Collier on Bankruptcy*, ¶ 523.08[1] (16th ed.); 11 U.S.C. § 523(a)(2)(B).  Evidence presented by Ms. Andrews that relates to false representations concerning the Loan Application will be discussed later in this Opinion.

[13] According to Black's Law Dictionary, a "letter of credit" is "[a]n instrument under which the issuer (usu. a bank), at a customer's request, agrees to honor a draft or other demand for payment made by a third party (the beneficiary), as long as the draft or demand complies with specified conditions, and regardless of whether any underlying agreement between the customer

it may be unfortunate that neither Ms. Andrews nor her husband, both attorneys, knew or were familiar with the definition of a "letter of credit," they could have ascertained the meaning had they checked Black's Law Dictionary or another resource, as the information was readily available. Ms. Andrews drafted the Sales Contract, the words and phrases used were of her own choosing, and if she chose a phrase or terminology different from what she intended, she is responsible. This Court believes that Ms. Andrews thought she was asking for something that would show Ms. Chamblee had good credit and could obtain a first mortgage loan of $700,000, and would demonstrate her ability to repay the second mortgage. In any case, the closing of the sale leads this Court to conclude that Ms. Andrews was satisfied she had received what the Sales Contract required.

The testimony of both Ms. Andrews and her husband indicated that at least to some extent they were relying on Countrywide to undertake the analysis of Ms. Chamblee's financial condition. Ms. Andrews testified that she did not ask Ms. Chamblee for tax returns or bank statements, that she never performed a credit check, and that she did not ask Ms. Chamblee about her bills and other obligations. Like the creditor in *Hunter*, Ms. Andrews did not conduct any investigation of her own into Ms. Chamblee's financial circumstances and never asked for any financial information from Ms. Chamblee, and thus could not expect that Ms. Chamblee would voluntarily divulge information she was not asked to provide. While this Court is sympathetic that Ms. Andrews has lost money, this Court is often faced with sympathetic creditors. When individuals agree to become lenders, they often unknowingly assume a risk without fully appreciating that risk. However, Ms. Andrews clearly understood that she was agreeing to loan money and that her security was a second mortgage on the real estate. Presumably, she assumed real estate values would remain level at worst. Any time loans

and the beneficiary is satisfied." *Black's Law Dictionary*, 8th Edition.

14

are made a risk is included, and it is the lender's responsibility to take steps to ensure it is a risk worth taking. There is no clear evidence as to how Ms. Andrews came into possession of the Loan Application, but it is clear the Loan Application was not a requirement of the Sales Contract. Further, it is clear that Ms. Chamblee provided a good faith estimate regarding the loan from Countrywide which reflected she was obtaining the first mortgage for $700,000. It appears to this Court that Ms. Andrews relied on the extension of credit by Countrywide in agreeing to close the sale and the second mortgage loan, and considered Countrywide's approval of Ms. Chamblee's first mortgage loan to be evidence of Ms. Chamblee's ability to repay the additional loan of $250,000 with interest. Ms. Andrews has not established by a preponderance of the evidence that Ms. Chamblee engaged in false pretenses, false representations, or actual fraud in obtaining the second mortgage for purposes of section 523(a)(2)(A).

Even if Ms. Andrews established the first element under section 523(a)(2)(A), her reliance would not have been justifiable. "Justifiable reliance is gauged by an *individual standard* of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case." *Sears*, 533 Fed. App'x at 945 (citation omitted). "To determine whether the misrepresentations were made with an intent to deceive is a subjective issue and a review of the totality of the circumstances is relevant in determining a debtor's intent." *Santa Ana Unified School District v. Montgomery (In re Montgomery)*, 489 B.R. 609, 625 (Bankr. N.D. Ga. 2013). From the testimony, it is clear that Ms. Andrews relied on the terms of the second mortgage from Ms. Chamblee because Ms. Andrews made a similar financing arrangement when she purchased a home. However, the standard is not solely that a plaintiff relied on a contract or arrangement, but that the plaintiff justifiably relied on

a misrepresentation. In this case, Ms. Andrews advanced a loan of $250,000 to Ms. Chamblee without seeking any proof that Ms. Chamblee could repay the loan. She asked only for a "letter of credit" or "affirmation of loan," neither of which would have given Ms. Andrews any financial information.

Ms. Andrews admitted that she drafted the Sales Contract without obtaining any assistance. However, Ms. Andrews, as an attorney, had the capacity to determine what she should ask for in the Sales Contract, or at least, to obtain the assistance of someone versed in loan transactions to draft the Sales Contract. This was not Ms. Andrews's first real estate transaction or experience with mortgage loans, so she would have had some idea of the complexity involved. Ms. Andrews, and her attorney husband, knew, could have known, or should have known the meaning of the terms used in the Sales Contract drafted by Ms. Andrews, and the importance of investigating the financial information and facts about Ms. Chamblee before undertaking a significant loan transaction. To the extent that Ms. Andrews was seeking financial information, it is clear from her questioning of Ms. Chamblee that Ms. Andrews knew that the Contract could have been voided because the documentation she wanted was not provided by Ms. Chamblee, yet Ms. Andrews nonetheless chose to close the loan anyway. It is unfortunate that Ms. Andrews was not more clear in the Sales Contract about the information she wanted, but she is the person who drafted the Contract and could have ensured that it asked for exactly what she wanted, and perhaps refused to close the sale and loan when she did not get what she wanted. Therefore, any reliance Ms. Andrews had on Ms. Chamblee's silence was not justifiable.

**11 U.S.C. § 523(a)(2)(B)**

Ms. Andrews also seeks to have the debt excepted from discharge under section 523(a)(2)(B)

16

which addresses fraud involving a writing.  Section 523(a)(2)(B) of the Bankruptcy Code provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt -
> ...
>    (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
> ...
>       (B) use of a statement in writing--
>          (i) that is materially false;
>          (ii) respecting the debtor's or an insider's financial condition;
>          (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>          (iv) that the debtor caused to be made or published with intent to deceive[.]

Ms. Andrews contends that Ms. Chamblee made false statements on the Loan Application, on which she relied in deciding to make a loan to Ms. Chamblee.  In this case, the first two elements are easily established.  "A statement is materially false for purposes of section 523(a)(2)(B) if it paints a substantially untruthful picture of financial conditions by misrepresenting information of the type that would normally affect the decision to grant credit." *Delta Community Credit Union v. Greene (In re Greene)*, BK No. 13-65956-MGD, AP No. 13-05326, 2013 WL 6911376, at *2 (Bankr. N.D. Ga. 2013) (citation omitted).  Writings that concern "the debtor's or an insider's financial condition" are "financial-type statements including balance sheets, income statements, statements of changes in financial position, or income and debt statements that proved what may be described as the debtor or insider's net worth, overall financial health or equation of assets and liabilities." *Knotts v. Williams (In re Willams)*, AP No. 02-00263, BK No. 02-05988 (Bankr. N.D. Ala. Sept. 11, 2003) (Mitchell, J.) (*quoting Skull Valley Band of Goshute Indians v. Chivers (In Re Chivers)*, 275 B.R. 606, 615 (Bankr. C.D. Utah 2002)).

Ms. Chamblee's original  Loan Application contained information regarding her income and

17

Case 12-05491-TOM7   Doc 35   Filed 04/30/14   Entered 04/30/14 12:30:28   Desc Main
Document      Page 17 of 25

assets as well as her liabilities.  Undisputably some of the information that would be of particular interest to a potential creditor, such as her income and bank balance, was inaccurate.  Whether the information on the Loan Application rose to the level of false representations made with the intent to deceive Ms. Andrews,[14] and whether Ms. Andrews reasonably relied on that incorrect information or those representations, are the more difficult questions.

The fact that the Loan Application contained inaccurate information does not by itself equate to an intent to deceive.  Ms. Chamblee testified that she did not complete the Loan Application herself, but provided the information to Countrywide loan officer Jennifer Fiske over the telephone. Ms. Chamblee explained that her bank account contained $3,000 instead of $300,000, and that she did not have employment income of $15,000 per month but did have deposits into her account totaling between $10,000 and $15,000 per month.  It is plausible that Ms. Chamblee provided incorrect information but it is also plausible that the inaccuracies were the result of mistake.  Ms. Chamblee's testimony that after she received the Loan Application in the mail she contacted Ms. Fiske to inform her of the problems, and on Ms. Fiske's instruction signed and returned the Application, strongly suggests to this Court that Ms. Chamblee did not create the inaccuracies with the intent to deceive but that somehow in the transmittal of information via telephone and the information having been input onto a form by someone else, mistakes were made and inaccurate data was reported.  Further, the Sales Contract with Ms. Andrews did not require that Ms. Chamblee

---

[14] The Loan Application was prepared for Countrywide for the purpose of Ms. Chamblee obtaining a first mortgage loan.  While Ms. Andrews claims to have received the Loan Application via email from either Ms. Chamblee or from Countrywide there is no evidence that she received it from either source.  If Ms. Chamblee did not give, or cause Countrywide to give, the Application to Ms. Andrews then there can be no intent to deceive Ms. Andrews at all.  The Court does not make a finding regarding how or when Ms. Andrews received the Application.

18

provide a loan application, so even if the Loan Application for Countrywide made its way to Ms. Andrews she was not the intended recipient. Thus, since Ms. Andrews was an unintended recipient there could not have been an intent to deceive her with the information on the Loan Application. Ms. Andrews has not met her burden as to this element.

Even if this Court had concluded that Ms. Chamblee had made materially false statements with the intent to deceive, any reliance that Ms. Andrews had on the false statements must have been reasonable. According to Ms. Andrews she relied on the information contained in the Loan Application because Ms. Chamblee did not provide her with a "letter of credit" or "affirmation of loan" that the Contract required. Taken literally, the demand in the Sales Contract for an "affirmation of loan" meant an affirmation that Ms. Chamblee could get a first mortgage loan. Ms. Andrews received what she asked for in the Sales Contract, as Ms. Chamblee's first mortgage loan from Countrywide did close. Although Ms. Andrews got what she asked for, she may not have gotten what she was really seeking but did not ask for; i.e., information relating to Ms. Chamblee's creditworthiness. Thus, any reliance by Ms. Andrews on the Loan Application was misplaced since she received an "affirmation of loan" as requested.

Assuming, for purposes of this Opinion, that Ms. Andrews permissibly relied on the Loan Application, she must establish that her reliance was reasonable. Reasonable reliance required under this section is a higher standard than the justifiable reliance required under section 523(a)(2)(A). *Field v. Mans*, 516 U.S. 59, 72-75, 116 S. Ct. 437, 445-46 (1995). Whether the creditor's reliance on a writing is reasonable will depend on the particular circumstances of a case, with relevant considerations being, among other things, "whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; . . . whether there were any 'red flags' that would

19

have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and . . . whether even minimal investigation would have revealed the inaccuracy of the debtor's representations." *Davenport v. Frontier Bank (In re Davenport)*, 508 Fed. Appx. 937, 938 (11th Cir. 2013) (*aff'g* 2012 WL 2590828, (M.D. Ala. July 5, 2012)).

Ms. Andrews and Ms. Chamblee met each other as a result of Ms. Chamblee searching for a new home; thus there were no prior business dealings between the two that would have given Ms. Andrews reasons to either trust or distrust any representation made by Ms. Chamblee. However, there were "red flags" that should have signaled to Ms. Andrews the need to further investigate the accuracy of the information on the Loan Application. For instance, Ms. Andrews knew the home was not constructed in 2002 as reported on the Application. Furthermore, Ms. Andrews testified that she knew from speaking with Ms. Chamblee that she had a son, and therefore should have recognized another error on the Loan Application. According to the Loan Application Ms. Chamblee had $300,000 in a bank account yet she sought to borrow $250,000 from Ms. Andrews at a cost of $50,000 in interest. The Andrews did not question why Ms. Chamblee would incur a debt to Ms. Andrews despite having the means to pay the remainder of the purchase price and avoid paying interest. The idea that Ms. Chamblee would keep in one bank account a sum exceeding the FDIC insurance limits should have also been a red flag. Furthermore, the Loan Application reflects substantial credit card debt of roughly $40,000. Ms. Andrews should have questioned why someone would keep $300,000 in a bank account while carrying credit card balances with high interest rates. Even though the Loan Application clearly stated that it could be amended, Ms. Andrews never asked Ms. Chamblee if any information had changed or asked if the Application had been amended before closing on the sale and loan. Despite the red flags noted, the Andrews did not attempt to further

20

investigate Ms. Chamblee's finances.  If Ms. Andrews had performed only minimal investigation, she would have discovered Ms. Chamblee's financial condition was not as it appeared on the Loan Application.  Therefore, based on the red flags noted, any reliance Ms. Andrews placed on the statements in Ms. Chamblee's Loan Application was not reasonable.

Ms. Andrews has not established by a preponderance of the evidence that Ms. Chamblee made false statements on the loan application with the intent to deceive, nor has she established that her reliance on the loan application was reasonable.  The debt Ms. Chamblee owes to Ms. Andrews is not excepted from discharge under section 523(a)(2)(B).

## 11 U.S.C. § 523(a)(6)

Ms. Andrews finally contends that she suffered a willful and malicious injury by Ms. Chamblee and therefore the debt owed by Ms. Chamblee is nondischargeable pursuant to section 523(a)(6).  That section provides:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt –
> . . .
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

According to the Eleventh Circuit:

> Section 523(a)(6) of the Bankruptcy Code excepts from discharge in bankruptcy "any debt ... for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). We have interpreted "willful" to require "a showing of an intentional or deliberate act, which is not done merely in reckless disregard of the rights of another." *Lee v. Ikner (In re Ikner)*, 883 F.2d 986, 991 (11th Cir.1989); *Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257, 1263 (11th Cir.1988).  As used in section 523(a)(6), "malicious" means "'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.'" *In re Ikner*, 883 F.2d at 991 (*quoting Sunco Sales, Inc. v. Latch (In re Latch)*, 820 F.2d 1163, 1166 n.4 (11th Cir.1987)). Malice may be implied or constructive. *Id*. ("Constructive or implied malice can be found if the nature of the act itself implies

21

a sufficient degree of malice.").  In other words, "a showing of specific intent to harm another is not necessary." *Id.*

*Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1163 - 64 (11th Cir. 1995) (footnote omitted).  To have a debt declared nondischargeable pursuant to section 526(a)(6) a creditor must prove the injury was both willful and malicious.  *Anglin v. Wallis (In re Wallis)*, AP No. 10-00010, 2011 WL 2357365, at *9 - *10 (Bankr. N.D. Ala. Mar. 31, 2011) (*citing Vickers v. Home Indemnity Co. (In re Vickers)*, 546 F.2d 1149, 1150 (5th Cir. 1977)).  Like many other circuits, the Eleventh Circuit Court of Appeals has adopted the approach that "willful" for purposes of section 523(a)(6) means the actor must have intended the actual injury, not just have intended the act that causes the injury.  *Walker*, 48 F.3d at 1164.

There is no question that Ms. Andrews suffered an injury as a result of her loan transaction with Ms. Chamblee.[15]  Ms. Andrews financed for Ms. Chamblee $250,000 of the home's purchase price and expected to be repaid the financed amount with $50,000 interest within two years of the loan.  Instead, Ms. Andrews has been repaid only $44,000.  It is Ms. Andrews's contention that Ms. Chamblee obtained the loan through fraudulent means; therefore, her failure to repay the loan equals a willful and malicious injury under section 523(a)(6).  However, under the Eleventh Circuit's interpretation of this section Ms. Andrews must establish that Ms. Chamblee intended that Ms.

---

[15] The Court also notes that Ms. Andrews did not elect to mitigate or minimize her loss, although she could have attempted to do so in several ways: she could have purchased the house back from Ms. Chamblee with some creative, interest-only financing or by borrowing money using other property she owned as collateral; she could have approached Countrywide about assuming the loan; or she could have refused to agree to the short sale and instead bid on the property at a foreclosure sale on the "courthouse steps."  She could have then marketed the property herself or held it until real estate values began to rise then sold it and recouped her money.  However, it is understandable that Ms. Andrews agreed to a short sale hoping that if she obtained a civil judgment against Ms. Chamblee it would be collectible.

22

Andrews would never recover on the Note and mortgage; the means by which she obtained the loan are irrelevant.

Ms. Chamblee testified that she made payments on the first mortgage loan for the first two years of owning the home and further that she spent approximately $100,000 in making home improvements. She attempted to sell the home when she could no longer make payments and staved off Countrywide's foreclosure of the first mortgage for a substantial period of time. She testified that she tried to keep Ms. Andrews informed of her efforts to sell the house. It seems unlikely that Ms. Chamblee would have made payments on the first mortgage and built up the equity in the home if she never intended to pay Ms. Andrews and thus risk losing the home in foreclosure. It is also unlikely that, if she had not intended to pay, that she would have worked to sell the house when she instead could have stopped making payments and used successive chapter 13 bankruptcy cases to hold off her mortgage creditors. She could have just prolonged and postponed foreclosure for as long as possible then let Countrywide foreclose, at which point Ms. Andrews would have received nothing. Ms. Andrews has not proven that Ms. Chamblee never intended to pay the debt owed to her, and therefore has not established that Ms. Chamblee willfully injured Ms. Andrews. The debt should not be excepted from discharge under section 523(a)(6).

## CONCLUSION

Ms. Andrews contends that Ms. Chamblee made false representations, particularly on the Loan Application prepared for Countrywide, and if not for those false representations Ms. Andrews would not have made the loan to Ms. Chamblee. Furthermore, Ms. Andrews contends that she suffered a willful and malicious injury as a result of Ms. Chamblee's false representations. Ms. Andrews asserts as a result that the debt owed to her by Ms. Chamblee should be excepted from

23

discharge under sections 523(a)(2)(A), 523(a)(2)(B), and/or 523(a)(6). However, Ms. Andrews has not established by a preponderance of the evidence that the debt should be excepted from discharge under any of these subsections. There is insufficient evidence that Ms. Chamblee had an obligation to provide unsolicited financial information to Ms. Andrews, that Ms. Chamblee made materially false representations on the Loan Application with the intent to deceive, that any reliance by Ms. Andrews on the Loan Application was reasonable, or that Ms. Chanblee willfully injured Ms. Andrews. There is no evidence of any ill intent by Ms. Chamblee. This Court cannot conclude that Ms. Chamblee intended to defraud Ms. Andrews by falling upon hard times.

This Court finds that the Ms. Andrews has failed to prove that any debt owed to her should be declared nondischargeable under sections 523(a)(2)(A), 523(a)(2)(B), or 523(a)(6). Accordingly, it is hereby

**ORDERED, ADJUDGED, AND DECREED** that the relief sought by the Plaintiff, Gail Andrews, to declare certain indebtedness of the Debtor, Cheryl Chamblee, nondischargeable in accordance with 11 U.S.C. § 523(a)(2)(A) is **DENIED**. It is further

**ORDERED, ADJUDGED, AND DECREED** that the relief sought by the Plaintiff, Gail Andrews, to declare certain indebtedness of the Debtor, Cheryl Chamblee, nondischargeable in accordance with 11 U.S.C. § 523(a)(2)(B) is **DENIED**. It is further

**ORDERED, ADJUDGED, AND DECREED** that the relief sought by the Plaintiff, Gail Andrews, to declare certain indebtedness of the Debtor, Cheryl Chamblee, nondischargeable in accordance with 11 U.S.C. § 523(a)(6) is **DENIED**. It is further

**ORDERED, ADJUDGED, AND DECREED** that the indebtedness of the Debtor, Cheryl Chamblee, to the Plaintiff, Gail Andrews, is **DISCHARGEABLE** and shall be included in the

discharge of the Debtor to be entered in this case by order of this Court.

Dated: April 30, 2014

/s/ Tamara O. Mitchell
TAMARA O. MITCHELL
United States Bankruptcy Judge

TOM/dgm

xc:     Gail Andrews, Plaintiff
        Lee Benton, attorney for Debtor
        Jamie Wilson, attorney for Debtor
        Cheryl Chamblee, Debtor
        Thomas E. Reynolds, Trustee

25